## BRIGGS v. BOSTON.
### No. 192.

District Court, N. D. Iowa, Cedar Rapids Division.

July 25, 1936.

Grimm, Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, Iowa, for plaintiff.

Barnes, Chamberlain & Hanzlik, of Cedar Rapids, Iowa (Don Barnes, of Cedar Rapids, Iowa, of counsel), for defendant.

SCOTT, District Judge.

This is a suit in equity by Thomas W. Briggs, doing business under the trade-name of the Welcome Wagon Service Company, an employer, against Grace Boston, a former employee, to enjoin the defendant from violating a covenant of a contract of employment, by the terms of which covenant defendant agreed that, upon the termination of the employment by either party, she would not engage for a period of five whole years from the date of such termination, directly or indirectly, in the same or

in a similar and competitive business in any city or town in which the plaintiff was engaged in rendering its service.

The plaintiff is a citizen of the state of Tennessee, and a resident of Memphis, and the defendant is a citizen of the state of Iowa, and a resident of Cedar Rapids. Jurisdiction rests upon diversity of citizenship and the alleged requisite amount in controversy. Plaintiff in his bill for cause of action, in substance, alleges that he is engaged in the advertising business, having contracts with mercantile advertisers in a large number of cities and states. That plaintiff's business is to advertise articles sold and services rendered by those with whom plaintiff has contracts for advertising. That plaintiff's plan of advertising consists of direct personal solicitation by calling on prospective customers by a representative called a "hostess." That calls by hostesses are made upon newly married couples, and upon newcomers who have changed their places of residence and have come to reside in the locality in which plaintiff has established his advertising business. That plaintiff advertises by direct personal visit and by tactful and indirect solicitation, and the custom of newcomers and newly married couples is thus sought for plaintiff's advertising customers.

That on or about the 17th of April, 1934, plaintiff entered into a written contract with defendant, under which defendant was to represent plaintiff in the city of Cedar Rapids, Iowa, as hostess, and that said contract provides:

"Hostess agrees to devote her entire time and attention to the business and perform and discharge all the duties incident to said position, as contemplated by the service which the Company is rendering to advertisers, among which duties will be to secure the names of newcomers from all available sources, to call upon them and present the advertising matter for the Company's customers, to cooperate with the customers or advertisers whom the Company is serving in every reasonable way so as to make the service rendered by the Company effective and efficient. She will lend her assistance in every reasonable way to building up the business and maintaining the service of the Company, and she will exert her efforts toward procuring new accounts and new advertising contracts for the Company. She will pay all local expenses, including the cost of procuring names, telephone, office, automobile, stamps, printing Mayor's letters and hostess cards.

Hostess will have Company's name listed in telephone directory, using her number. Hostess will make no purchases, hire no help, nor incur any liability for or in the name of the Company.

"If the Company is able to procure its regular automobile agreement with a dealer in said city, hostess will pay the cost of full coverage insurance, gas, oil and upkeep on said automobile, and all expenses incumbent upon the Company under its said automobile agreement. If the Company is unable to procure said automobile agreement for said city, then Hostess agrees to provide an automobile for the service with the wording "Welcome Wagon" painted on the doors, and to carry full coverage insurance thereon for the protection of the Company, and in addition she will provide gas, oil and upkeep of said automobile at her expense. In cases where the automobile used is under the Company's automobile agreement the insurance is effected by the dealers; in said cases where the hostess provides the automobile she may effect the insurance, in which event she will send policy or policies to the Company's Home Office, or the Company may effect said insurance at her expense.

"In full compensation for her services and expenses, hostess will receive a sum equivalent to fifty per cent. of the gross receipts from the business done by the Company in said city, said commissions to be payable monthly, statements and remittances of which will be made on or before the fifteenth of the month on all collections received from business done the preceding months; provided, if any accounts, national or local are procured through other agencies, the agency commissions on such accounts will be deducted, and Hostess will receive fifty per cent. of the net instead of the gross on such accounts.

"Hostess will not accept employment or gratuities from advertisers or others with whom she comes in contact in a business way, through the business of the Company, and all sums earned by her through contracts arising out of the Company's business will belong to the Company.

"It is understood that hostess will assist in collecting the monthly bills from the advertisers and that in the event any of the advertisers' accounts become delinquent to the extent that it becomes necessary to collect through another agency, the cost of such collection is to be borne in equal proportions by hostess and Company.

"It is further understood and agreed that if the Hostess' connection with the Company is at any time severed by either party, or if the Hostess is transferred to other duties that remove her from above named city, any accounts due the Company except the current month's bills shall be collected, if possible, by her successor and it is understood, that, her successor shall be paid 25% of the amounts so collected; which 25% will be charged to and deducted by the Company from commissions due Hostess.

"It is understood and agreed that the scheme of advertising through the means of a Welcome Wagon Service involves plans, systems and trade uses and secrets which the Company and its predecessor have had in general use for a long period of time and which has been developed and extended at great expense, with which plans, etc., Hostess, by virtue of this employment, necessarily becomes acquainted; and that it is the purpose and intent of the Company to introduce and operate its service in the cities and towns throughout the United States and Canada, as fast as it is practicable to do so. Now, then, for and in consideration of the employment and the compensation to be earned and paid to Hostess hereunder Hostess agrees that upon the termination of this employment, by the act of either party, she will not engage, for a period of five whole years from the date of such termination, directly or indirectly, for herself or as the representative or employee of others, in the same or in a similar and competitive business, in any city or town in which the Company is then engaged in rendering its service.

"The Company's service is to be rendered daily. In event of illness of Hostess or her inability, for any reason to perform the service, she will have it performed by a competent substitute, giving the Company immediate notice of the fact. If she should leave said city or quit the service without first giving the Company notice and procuring its permission and without arranging for the service to be performed by a competent substitute, this contract will automatically be terminated, and she will forfeit, as liquidated damages, any interest, salary or commission she might be entitled to up to that date.

"It is further agreed that the terms of this contract will be binding upon the parties, except as changed by mutual agreement, so long as the Hostess is in the employ of the Company, whether in the ca-pacity of Hostess, or in any other capacity, or whether working in said city or any other place to which she may be transferred."

That defendant entered upon her duties as hostess and represented plaintiff in Cedar Rapids until about December 15, 1935, on which date defendant terminated her employment by resignation, and almost immediately thereafter violated the terms of the contract by engaging in the business of representing business houses in Cedar Rapids, Iowa, including business houses formerly represented by the plaintiff, and by rendering services as a hostess, and is calling upon and welcoming newcomers and newly married couples to the city of Cedar Rapids, and is engaged in the same and similar business as the plaintiff, and in direct competition with the plaintiff.

That plaintiff's business is original and unique, and is specialized and peculiar in its nature, and has required and has received the expenditure of much thought and ingenuity in its development. That plaintiff has devised and is using special methods peculiar to his business, which constitute trade secrets. That all this was necessarily imparted to defendant and disclosed to her solely for the purpose of enabling her to act efficiently. That the methods and trade secrets which defendant learned as aforesaid, she is now using in carrying on an identical type of advertising business that competes directly with plaintiff.

With few exceptions all of the foregoing allegations of the bill are admitted in defendant's answer. The material exceptions not admitted, and upon which issue is joined, are:

(1) The jurisdictional allegation of an amount in controversy in excess of $3,000.

(2) That plaintiff's plan involves matters original and unique, amounting to trade secrets.

(3) That defendant has violated the provisions of said contract so far as soliciting or aiding in the procuring of advertising contracts is concerned; but defendant admits that she is otherwise competing with the plaintiff.

(4) Defendant further in her answer challenges the mutuality of the contract, and pleads want of consideration for the restrictive covenant in controversy; and alleges that the contract was procured by fraud and false representations, in substance, as follows: That plaintiff repre-

sented that he had a plan which was original and unique and involved secrets not known to the public; that defendant's work would in effect be without competition and very remunerative; and relying thereon she signed the contract.

Plaintiff's bill prays for a preliminary injunction, and that on final hearing the injunction be made perpetual, and for general equitable relief. The prayer for preliminary injunction upon the bill and answer was heard and submitted upon affidavits.

Before proceeding to the merits, it is fitting that the court dispose of the jurisdictional question. The test is, Is the plaintiff's business, as established in Cedar Rapids, of a value in excess of $3,000, exclusive of interest and costs? I think I must consider that question upon the assumption that plaintiff's business will continue, and that contracts, such as the one involved here, can be had with employees. Measuring the value of plaintiff's business by his income from Cedar Rapids customers, I think plaintiff has made a prima facie case so far as value of the matter in controversy is concerned. It will be observed that plaintiff takes one-half of the gross receipts; the hostess, however, paying all of the expenses of the business, gets the balance of the other half only.

From the admitted allegations of the bill and supporting proofs received in evidence, I find the following facts:

(1) That plaintiff, Thomas W. Briggs, at the time of the commencement of this suit, was a citizen of the state of Tennessee; that defendant, Grace Boston, was a citizen of the state of Iowa and a resident of the city of Cedar Rapids in said state; and that the controversy in suit involves a sum, exclusive of interest and costs, exceeding the amount of $3,000.

(2) That plaintiff is engaged in the advertising business in numerous cities and states throughout the United States and Canada under a plan which involves the employment of representatives in different cities called hostesses. That these hostesses are employed under written contract defining their duties, among which are the obtaining of the names of newcomers to the city in which the hostess is employed and all newly married couples, and personally calling upon such newcomers and newly married couples for the purpose of advertising the wares and services of those under contract with the plaintiff for adver-

tising. That in pursuance of plaintiff's plan the hostess is required to approach the prospective customer in a rather indirect and devious way, first arming herself with a letter from the mayor of the city, purporting to welcome the newcomer or newly married couple to the city, and by tactful and gracious address interest the prospective customer in the goods and services of advertisers; and in short, to do the things specified in the written contract.

(3) That on or about the 17th day of April, 1934, plaintiff, through his representatives, claiming his plan to be original and unique, and embracing trade secrets unknown to the public, and which in effect would protect against competition, and that under his terms lucrative income could readily be obtained by hostesses, induced the defendant, Grace Boston, to enter into the contract described in his bill and which contained the matters and things hereinbefore set out. That at the time plaintiff had some six or seven contracts with advertisers in Cedar Rapids, but represented that he proposed and expected to largely increase that number.

(4) That defendant began work under the contract and continued until about the month of December, 1935. That a few additional advertising contracts were obtained, but that plaintiff's business in Cedar Rapids, by reason of competition hereinafter stated, languished and diminished to the point where defendant was unable to earn a living remuneration.

(5) That during the latter part of the year 1935, certain merchants in the city of Cedar Rapids organized an association called the Civic Activities League, the purpose of which was to engage in the same line of activities and business as the plaintiff in Cedar Rapids, and this League obtained a contract with the Cedar Rapids Gazette Company, publisher of the only daily newspaper in Cedar Rapids, and so entered into active competition with the plaintiff, and, being allied with the only daily newspaper in the city, soon obtained nearly all of plaintiff's advertising customers.

(6) That on or about December 15, 1935, defendant resigned and quit the employ of the plaintiff, and entered into the employ of the Civic Activities League, under which employment she thereafter performed the same duties required of her by her contract with the plaintiff, except that she took no part in obtaining advertising contracts or customers.

(7) That any representation by plaintiff to the defendant as inducement to enter into the contract in question to the effect that his plan embraced trade secrets was unfounded in fact, for that plaintiff's plan involved no trade secrets, and defendant's employment resulted in no special confidences, but that all essentials of plaintiff's plan were openly demonstrated to all prospective customers.

(8) That plaintiff operating under his plan never possessed nor divulged any trade secrets to the defendant. Nor had the plaintiff in his plan any element or quality which was or might be the subject of appropriation. Nor had plaintiff built up and established any good will which would be affected in any way peculiar to the defendant by reason of defendant's engaging in employment with a competitor.

(9) That under plaintiff's plan he was to receive one-half of the gross income, and the defendant the other half, out of which, however, she was to pay all of the expenses of the business, and receive only the net of such other half, and no other compensation.

(10) That defendant under her employment with the Civic Activities League performs no duty or service competing with the plaintiff, which plaintiff cannot readily and without hardship or sacrifice obtain in the open market another to perform.

(11) That defendant under her employment with the Civic Activities League performs no duty or service competing with the plaintiff, which the Civic Activities League could not readily and without hardship or sacrifice obtain in the open market another to perform.

The question now occurs, Is this record such as to require a court of equity to grant the plaintiff injunctive relief restraining the defendant from further pursuing her employment by the Civic Activities League because such employment violates the covenant in her contract with the plaintiff against engaging in competitive work after the termination of such employment? The answer to this question involves a consideration of the general character of the contract between plaintiff and defendant; the extent and nature of defendant's employment by the League, as well as the rule of law applied to such restrictive covenants.

Viewing the contract from the point of mutual considerations, it is extremely harsh and unfair. The plaintiff without any established business of consequence by the terms of the contract required the employee to build up a business for him, and during the process to surrender one-half of the gross receipts of the business and pay all of the expenses of the business out of her half. He paid no salary nor assured the plaintiff a single week's employment; nor did he guarantee reimbursement for expenses paid and lost. He reserved a position in which he could use the defendant to build up a business to a paying point and then terminate the contract without even a period's notice. The only element of mutuality involved was the mere fact of employment. The contract as a whole rivals that probably fictitious incident of the old rafting days on the Mississippi. It is said that an ingenious individual of a river town conceived the idea of accumulating wealth in the drift log business. His plan was to enter into contracts with individuals at the different points to catch drift logs and float them down to the nearest sawmill for sale on the half shares with him. There is nothing in the contract itself to induce a court of equity to strain in the least its conscience to prevent impairment. Notwithstanding the representations made to the defendant as inducement and that provision in the contract wherein the parties agree that the employment involves the communication of trade secrets, there is no trade secret involved. A trade secret is defined: "A trade secret is a plan or process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it is necessary to confide it in order to apply it to the uses intended." 32 C.J. 156, Injunctions, § 210, and notes citing cases.

Coming now to the question of the extent of the defendant's breach of covenant, we find that defendant, when she reached the point where she must either quit or starve, quit. This was her legal right. She then took employment with a competitor under which she is presumably receiving a satisfactory remuneration. She refrained from engaging in that part of her employer's business which would require her to solicit plaintiff's advertising customers or induce them to enter into contracts with her new employer. She engaged in that part of the work only which required contact after her employer had procured the advertising contracts with customers. She called upon newly married

people and newcomers to the city. She used methods and tactics to ingeniously and deviously attract and hold the attention of her "prospects." But that was to be expected and indeed could not well be avoided, and it infringed nothing which was the subject of appropriation to the plaintiff. As stated in the findings, defendant engaged in no activity that her employer could not obtain others to engage in, or that the plaintiff could not readily obtain others to engage in likewise. Much is made in the briefs and in argument of the claim that the defendant was a peculiar individual, having an unusual acumen and accomplishments, and being particularly well trained. This argument does not particularly impress me. The hostesses, when they have their generally planned sale talk given them, proceed much alike. If one is permitted to paraphrase the late Mark Twain's frenchman in his comment upon the comparative agility of jumping frogs in Calaveras county, one might say: "Eh Bien! I no saw not that that ~~frog~~ hostess had nothing of better than each ~~frog~~ hostess." Indeed, it is rather difficult to imagine a person of transcendent mental acumen signing a contract of this character.

▌ It may be conceded that in modern times courts of equity have not held to the rule requiring denial of relief to an employer in all cases where his contract contained a restrictive covenant with his servant of this character. The modern rule is fairly well stated in Federal Law of Contracts, vol. 1, p. 529, § 271. "Agreement by employee not to compete. It has been established, as a general rule, from quite an early date, that an employee in consideration of his employment by a tradesman, manufacturer or professional man may bind himself, within reasonable limitations, not to carry on or engage in the same trade or profession after leaving the employment. This rule is recognized in the federal courts. In this connection Taft, Circuit Judge (later Chief Justice) [U. S. v. Addyston Pipe, etc., Co. (C.C.A.) 85 F. 271, 46 L.R.A. 122] in an exhaustive review of the question as to the validity of contracts in restraint of trade, says, obiter, in reference to contracts by an employee not to compete with his employer, after termination of the service: 'Again, it was of importance that business men and professional men should have every motive to employ the ablest assistants, and to instruct them thoroughly; but they would

naturally be reluctant to do so unless such assistants were able to bind themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers. * * * 'In such a case the public derives an advantage in the unrestrained choice which such a stipulation gives to the employer of able assistants, and the security it affords that the master will not withhold from the servant instruction in the secrets of his trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business.' (quoting from English case) * * * For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements * * * (5) by an assistant, servant, or agent not to compete with his master or employer after the expiration of his time of service * * * the court must find that the restraints attempted thereby are reasonably necessary * * * to protection from the danger of loss to the employer's business caused by the unjust use on the part of the employee of the confidential knowledge acquired in such business."

Examination of this text, together with the opinion of Taft, then Circuit Judge, cited, and the opinion of Circuit Judge Hutcheson in Super Maid Cook-Ware Corporation v. Hamil, 50 F.(2d) 830 (Fifth Circuit), and cases cited, fairly well discloses the rule now followed in federal courts without the necessity of further citation. The tests are: First, is the basic contract fair and equitable; second, is the restrictive covenant reasonably necessary for the protection of the basic contract; and, third, if no trade secrets or peculiar confidences which the plaintiff is entitled to have held inviolate are communicated, are there other grounds for holding irreparable injury to the plaintiff as a consequence of defendant's act?

▌ Upon the record in this case I conclude that the restrictive covenant is not reasonably necessary for the protection of the basic contract, or any of plaintiff's legal rights therein. I further find no sufficient proof of irreparable injury to the plaintiff likely to follow as a consequence of the defendant's action. And for the reasons stated, plaintiff's prayer for preliminary injunction will be denied. A decree will be entered to that effect with findings consistent with this opinion.